**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEPHEN AIELLO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>BLACK ROCK COFFEE BAR, INC., MARK D. DAVIS, RODDERICK F. BOOTH, JEFF HERNANDEZ, DANIEL BRAND, JAKE SPELLMEYER, BRYAN PEREBOOM, RICHARD FEDERICO, SARAH GOLDSMITH-GROVER, ANDREW BRAITHWAITE, KRISTINA CASHMAN, J.P. MORGAN SECURITIES LLC, JEFFERIES LLC, MORGAN STANLEY & CO. LLC, ROBERT W. BAIRD & CO. INCORPORATED, STIFEL, NICOLAUS & COMPANY, INCORPORATED, WILLIAM BLAIR & COMPANY, L.L.C., RAYMOND JAMES & ASSOCIATES, INC.,<br><br>Defendants. | Case No. 1:26-cv-05181-JPO<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

Lead Plaintiff Plymouth County Retirement Association ("Plaintiff") makes the following allegations, individually and on behalf of all others similarly situated, by and through Plaintiff's counsel, upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, *inter alia*, counsel's investigation, which included, among other things, review and analysis of: (i) regulatory filings made by Black Rock Coffee Bar, Inc. ("BRC" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (ii) press releases, presentations, conference call transcripts, and media reports issued and disseminated by the Company; (iii) interviews and transcripts of interviews with former employees of the Company; (iv) public records; and (v) analyst reports, media reports, and other publicly disclosed reports and information about the Company and the industry. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE AND SUMMARY OF THE ACTION

1. Plaintiff brings this federal class action under §§11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act") against (i) BRC, (ii) certain of the Company's senior executives and directors who signed the Registration Statement, declared effective September 11, 2025, issued in connection with the Company's initial public offering ("IPO" or "Offering"), and (iii) the underwriters of the Offering (collectively, "Defendants"). Plaintiff alleges that the Registration Statement and Prospectus for the IPO (the final amendment to which was filed with the SEC on Form S-1/A on September 9, 2025, and the Prospectus for which was filed on Form 424B4 on September 15, 2025), including all amendments thereto (collectively, the "Offering Documents"), contained materially incorrect or misleading statements and/or omitted material information that was required by law to be disclosed. Defendant BRC, as the issuer of the securities at issue, is strictly liable for such misstatements and omissions. Each Defendant other

than BRC itself is also strictly liable for such misstatements and omissions in their capacities as signers of the Registration Statement and/or as underwriters, statutory sellers, and/or offerors of the shares sold pursuant to the Offering.

2. This case concerns BRC—an operator of coffee bars concentrated in seven western and southwestern states. It arises from BRC's September 2025 IPO, in which the Company sold 16,911,764 shares of BRC Class A common stock to the public at $20.00 per share, raising approximately $338.2 million in gross proceeds.

3. The Offering Documents sold investors a growth story that rested on several factors, including: (i) adding new stores in existing areas or "concentric circles" with minimal disruption; (ii) strong and "sustained" same store sales growth at existing stores, which had reached 9.2% and 10.9% in the two quarters before the IPO; (iii) rapid new-store development—approximately 20% annual store growth on a path to 1,000 stores by 2035; and (iv) low costs of building new stores, especially as compared to industry peers. The Offering Documents contained numerous false and misleading statements and omitted material facts regarding each of these.

4. Crucially, they all rested on undisclosed, material, and negative facts. To begin with, the Company was "opening stores out the wazoo" in high-volume existing locations, including stores within blocks of existing stores. This strategy led to heightened levels of store cannibalization, or "sales transfer," whereby new BRC stores drew sales away from nearby existing stores—at times to the tune of 50%.

5. Then, the traffic gains that powered the Company's pre-IPO same store sales growth were the product of one-time events in mid-2024: the relaunch of the Company's loyalty program and accompanying introduction of mobile ordering, which gave every new member a free drink; and the systemwide rollout of a new product line, "Frozen Fuel." Defendants launched on

a manic campaign to push the new loyalty program, and stores were "bombarded" with free drink requests. These loyalty transactions were factored into the same store sales growth figure. Meanwhile, the Frozen Fuel menu was a major one-time change that caused same store sales to "pop off" the charts.

6. Before those launches, same-store traffic had actually declined in each of the four quarters preceding June 2024. These launch-driven gains were inherently temporary, and once the Company began lapping those launches, BRC's traffic was bound to decline, especially given that the Company did not have another "magic trick" up its sleeve.

7. Furthermore, Defendants engineered the baseline for new store growth and failed to disclose that the jump in new stores could be attributed to the one-time purchasing up of all franchise stores prior to the IPO. At the same time, Defendants were able to claim lower store startup costs because these relied on arrangements whereby the million-dollar difference later came out of higher leases.

8. Numerous former employees outline each of these realities, while the reported numbers lay bare the falsity of the statements in the Offering Documents. Defendants later admit to the falsity of each category as well.

9. On May 12, 2026, BRC disclosed that same-store transactions had declined 0.6% in the first quarter of 2026, sales transfer from its densification efforts had created a 160-basis-point headwind to same store sales growth, and the transaction decline also reflected the lapping of "elevated transaction growth related to the early accelerated growth of our loyalty program."

10. On this news, BRC's stock price fell $3.32, or 30.3%, to close at $7.65 per share on May 13, 2026. By the commencement of this action, BRC stock has traded as low as $7.01 per share on May 15, 2026, an approximately 65% decline from the $20 per share Offering Price.

11. By this Action and based on Defendants' violations of the Securities Act as alleged herein, Plaintiff, on behalf of itself and other members of the Class (defined below), seeks to recover damages for the losses suffered in connection with the Class's purchases of BRC shares pursuant or traceable to the defective Offering Documents.

12. The claims asserted herein are strict liability claims:

(a) First, as the issuer, BRC is strictly liable for any material misstatements or omissions in the Offering Documents, regardless of whether they were made innocently, negligently, recklessly, or intentionally.

(b) Second, as signatories of the Offering Documents, each of the Individual Defendants (defined below) is strictly liable for any material misstatements or omissions in the Offering Documents, except that each such Individual Defendant has the right to attempt to establish, as to himself or herself, an affirmative defense of "due diligence," which they bear the burden of pleading and proving. 15 U.S.C. §77k(b).

(c) Third, as underwriters of the Offering, each of the Underwriter Defendants (defined below) is strictly liable for any material misstatements or omissions in the Offering Documents, except that each such Underwriter Defendant has the right to attempt to establish, as to itself, an affirmative defense of "due diligence," which it bears the burden of pleading and proving. 15 U.S.C. §77k(b).

(d) As the claims asserted herein are all grounded in strict liability or negligence predicated on the making of material misstatements and omissions as to each Defendant—and such liability for Defendant BRC as issuer is effectively absolute (and, as to each Individual and Underwriter Defendant, their liability is similarly

absolute unless they are later able to plead and carry their burden of proving a possible affirmative due diligence defense)—it is irrelevant whether the material misstatements and omissions alleged herein were made innocently, negligently, recklessly, or intentionally for purposes of pleading Plaintiff's *prima facie* case as to liability. Plaintiff expressly disclaims any allegation of fraud or intentional or reckless misconduct, and no allegation herein should be construed as alleging fraud.

## II. PARTIES

### A. Plaintiff

13. Lead Plaintiff Plymouth County Retirement Association purchased shares of BRC Class A common stock issued pursuant and/or traceable to the Offering Documents, as described in the PSLRA certification and Schedule A previously filed with this Court on August 17, 2026 (ECF No. 24), and suffered damages as a result of the federal securities law violations alleged herein.

### B. Defendants

#### 1. Black Rock Coffee

14. Defendant Black Rock Coffee Bar, Inc. is incorporated under the laws of the State of Texas and maintains its principal executive offices at 9170 E. Bahia Drive, Suite 101, Scottsdale, Arizona 85260. BRC's Class A common stock trades on the Nasdaq Global Market ("Nasdaq") under the symbol "BRCB." BRC is a holding company whose sole material asset is its equity interest in Black Rock Coffee Holdings, LLC ("Black Rock OpCo"), through which it conducts all of its operations under an "umbrella partnership-C-corporation," or "Up-C," structure. According to the Offering Documents, as of June 30, 2025, BRC employed more than 2,400 team members.

15. Pursuant to the Securities Act, BRC, as the issuer of the securities sold pursuant and/or traceable to the Offering Documents, is strictly liable for the materially inaccurate, misleading, and incomplete statements in the Offering Documents.

**2. The Individual Defendants**

16. Defendant Mark Davis ("Davis") is, and was at all relevant times, BRC's Chief Executive Officer ("CEO") and a director of the Company. Defendant Davis reviewed, approved, and participated in making statements in the Offering Documents, and signed or authorized the signing of the Registration Statement.

17. Defendant Rodderick F. Booth ("Booth") is, and was at all relevant times, BRC's Chief Financial Officer ("CFO"). Defendant Booth reviewed, approved, and participated in making statements in the Offering Documents, and signed or authorized the signing of the Registration Statement.

18. Defendant Jeff Hernandez ("Hernandez") is, and was at all relevant times, a director of the Company, and became Chairman of the Company's board of directors upon the effectiveness of the Registration Statement. Hernandez is one of the Company's Co-Founders and previously served as its CEO from 2010 to 2020. Defendant Hernandez reviewed, approved, and participated in making statements in the Offering Documents, and signed or authorized the signing of the Registration Statement.

19. Defendant Daniel Brand ("Brand") is, and was at all relevant times, a director of the Company and one of its Co-Founders. Defendant Brand reviewed, approved, and participated in making statements in the Offering Documents, and signed or authorized the signing of the Registration Statement.

20. Defendant Jake Spellmeyer ("Spellmeyer") was, at all relevant times, a director of the Company and one of its Co-Founders. Defendant Spellmeyer reviewed, approved, and

participated in making statements in the Offering Documents, and signed or authorized the signing of the Registration Statement.

21. Defendant Bryan Pereboom ("Pereboom") was, at all relevant times, a director of the Company and one of its Co-Founders. Defendant Pereboom reviewed, approved, and participated in making statements in the Offering Documents, and signed or authorized the signing of the Registration Statement.

22. Defendant Richard Federico ("Federico") is, and was at all relevant times, a director of the Company and became its lead independent director following the Offering. Defendant Federico reviewed, approved, and participated in making statements in the Offering Documents, and signed or authorized the signing of the Registration Statement.

23. Defendant Sarah Goldsmith-Grover ("Goldsmith-Grover") is, and was at all relevant times, a director of the Company. Defendant Goldsmith-Grover reviewed, approved, and participated in making statements in the Offering Documents, and signed or authorized the signing of the Registration Statement.

24. Defendant Andrew Braithwaite ("Braithwaite") is, and was at all relevant times, a director of the Company. Braithwaite has served on BRC's Board since December 2020 and has been a Managing Director, Principal, or Vice President of The Cynosure Group, LLC since July 2017. The Cynosure Group, LLC and its affiliates (the "Sponsor") were pre-IPO owners of BRC, and Braithwaite was the Board's Sponsor-affiliated director. Defendant Braithwaite reviewed, approved, and participated in making statements in the Offering Documents, and signed or authorized the signing of the Registration Statement.

25. Defendant Kristina Cashman ("Cashman") is, and was at all relevant times, a director of the Company. Defendant Cashman reviewed, approved, and participated in making

statements in the Offering Documents, and signed or authorized the signing of the Registration Statement.

26. Defendants Davis, Booth, Hernandez, Brand, Spellmeyer, Pereboom, Federico, Goldsmith-Grover, Braithwaite, and Cashman are collectively referred to herein as the "Individual Defendants."

27. Pursuant to the Securities Act, as directors of the Company and/or as signers of the Offering Documents, each Individual Defendant is strictly liable for the materially inaccurate, misleading, and incomplete statements in the Offering Documents. In addition, although not an element of Plaintiff's claims and an issue on which each Individual Defendant bears the burden of proof to the extent they seek to assert it as an affirmative defense, no Individual Defendant conducted an adequate due diligence investigation in connection with the matters alleged herein, and each will accordingly be unable to establish a statutory "due diligence" affirmative defense under the Securities Act.

**3. The Underwriter Defendants**

28. Defendant J.P. Morgan Securities LLC ("J.P. Morgan") was an underwriter of the Company's IPO and assisted in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. J.P. Morgan agreed to purchase 4,214,492 shares of the Company's Class A common stock in the IPO, exclusive of the option to purchase additional shares. J.P. Morgan acted as a joint book-running manager and as a representative of the underwriters and acted as the lead-left book-running manager of the IPO. In addition, a lender affiliated with J.P. Morgan held a pledge of 13,642,712 LLC Units (and the corresponding shares of Class C common stock) as collateral for a margin loan extended to entities controlled by the Co-Founders. Defendant J.P. Morgan conducts business in this District.

29. Defendant Jefferies LLC ("Jefferies") was an underwriter of the IPO and assisted in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Jefferies agreed to purchase 3,311,385 shares of the Company's Class A common stock in the IPO, exclusive of the option to purchase additional shares. Jefferies acted as a joint book-running manager and as a representative of the underwriters. Defendant Jefferies conducts business in this District.

30. Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") was an underwriter of the IPO and assisted in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Morgan Stanley agreed to purchase 3,311,385 shares of the Company's Class A common stock in the IPO, exclusive of the option to purchase additional shares. Morgan Stanley acted as a joint book-running manager and as a representative of the underwriters. Defendant Morgan Stanley conducts business in this District.

31. Defendant Robert W. Baird & Co. Incorporated ("Baird") was an underwriter of the IPO and assisted in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Baird agreed to purchase 1,505,175 shares of the Company's Class A common stock in the IPO, exclusive of the option to purchase additional shares. Baird acted as a joint book-running manager and as a representative of the underwriters. Defendant Baird conducts business in this District.

32. Defendant Stifel, Nicolaus & Company, Incorporated ("Stifel") was an underwriter of the IPO and assisted in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Stifel agreed to purchase 1,050,420 shares of the Company's Class A common stock in the IPO, exclusive of the option to purchase additional shares. Defendant Stifel conducts business in this District.

33. Defendant William Blair & Company, L.L.C. ("William Blair") was an underwriter of the IPO and assisted in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. William Blair agreed to purchase 1,050,420 shares of the Company's Class A common stock in the IPO, exclusive of the option to purchase additional shares. Defendant William Blair conducts business in this District.

34. Defendant Raymond James & Associates, Inc. ("Raymond James") was an underwriter of the IPO and assisted in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Raymond James agreed to purchase 262,605 shares of the Company's Class A common stock in the IPO, exclusive of the option to purchase additional shares. Defendant Raymond James conducts business in this District.

35. Defendants J.P. Morgan, Jefferies, Morgan Stanley, Baird, Stifel, William Blair, and Raymond James are collectively referred to herein as the "Underwriter Defendants." The Underwriter Defendants received underwriting discounts and commissions of $1.40 per share sold in the IPO.

36. Pursuant to the Securities Act, as underwriters of the IPO, each Underwriter Defendant is strictly liable for the materially inaccurate, misleading, and incomplete statements in the Offering Documents. In addition, although not an element of Plaintiff's claims and an issue on which each Underwriter Defendant bears the burden of proof to the extent it seeks to assert it as an affirmative defense, no Underwriter Defendant conducted an adequate due diligence investigation in connection with the matters alleged herein, and accordingly no such Defendant will be able to establish a statutory "due diligence" affirmative defense under the Securities Act. Each Underwriter Defendant committed acts and omissions that were a substantial factor leading to the harm complained of herein.

37. Each Underwriter Defendant is an investment banking firm whose activities include, *inter alia*, the underwriting of public offerings of securities. As underwriters of the IPO, the Underwriter Defendants met with potential investors in the IPO and presented highly favorable, but materially incorrect and/or materially misleading, information about the Company, its business, operations, plans, and financial prospects, and/or omitted the disclosure of material information required to be disclosed under the federal securities laws and applicable regulations promulgated thereunder.

38. The Underwriter Defendants also assisted BRC and the Individual Defendants in planning the IPO. They further purported to conduct an adequate and reasonable investigation into the business, operations, and plans of the Company, an undertaking known as a "due diligence" investigation. During their "due diligence" investigation, the Underwriter Defendants had continual access to confidential corporate information concerning the Company's business, financial condition, store-level sales and transaction data, development pipeline, plans, and prospects.

39. In addition to having access to internal BRC corporate documents and records, the Underwriter Defendants and/or their agents, including their counsel, had access to BRC's management, directors, employees, and attorneys to determine: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which BRC's Class A common stock would be sold; (iii) the language to be used in the Offering Documents; (iv) what disclosures about BRC would be made in the Offering Documents; and (v) what responses would be made to the SEC in connection with its review of the Offering Documents. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and BRC's management, directors, employees, and lawyers, as of the date of the IPO, the Underwriter

Defendants should have known of BRC's undisclosed then-existing problems, including the decline in same-store traffic before June 2024, the temporary nature of the transaction boost from the June 2024 launches, the sales transfer resulting from the Company's store placement, and of the Offering Documents' materially inaccurate, misleading, and incomplete statements and omissions, as detailed herein.

40. The Underwriter Defendants also demanded and obtained an agreement from BRC, under which BRC agreed to indemnify and hold the Underwriter Defendants harmless from any liabilities under the Securities Act.

41. The Underwriter Defendants, with the approval of the other Defendants, caused the Registration Statement to be filed with the SEC and declared effective so that they, and the Individual Defendants, could sell, and/or offer to sell, BRC shares to Plaintiff and other members of the Class pursuant to the Offering Documents.

## III. JURISDICTION AND VENUE

42. The claims asserted herein arise under and pursuant to §§11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§77k, 77l(a)(2), and 77o, respectively.

43. This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. §1331 and §22 of the Securities Act, 15 U.S.C. §77v.

44. Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because many of the acts and transactions giving rise to the violations of law complained of occurred, in part, in this District, including the dissemination of the Offering Documents within this District, and certain Defendants maintain offices and transact business in this District.

45. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the

United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Background of BRC

#### 1. BRC Operates a Chain of Coffee Bars

46. BRC operates a chain of company-owned coffee bars that pair drive-through service with in-store seating areas. Its stores sell coffee and espresso beverages, its proprietary "Fuel" energy drinks, and breakfast items.

47. Co-Founders Brand and Hernandez founded the business in 2008 in Beaverton, Oregon, as "a single 160 square foot coffee bar." Defendants Spellmeyer and Pereboom joined the leadership team in 2018.

48. BRC began as a drive-through only concept but ultimately began to include seating areas which it calls "lobbies." By June 30, 2025, all 158 of its stores had drive-throughs, and 118—approximately 75%—also had lobbies. The Company described this "dual-format model" as what "differentiates" it, pairing "drive-thru-first convenience" with "modern and inviting lobbies" that are "the perfect place to hang out, unwind, or kick back." It stresses its "elevated in-store experience" crafted by "engaging baristas."

49. BRC is a holding company. Its only material asset is its interest in Black Rock Coffee Holdings, LLC ("Black Rock OpCo"), which conducts all of its operations under an "umbrella partnership-C-corporation," or "Up-C," structure.

50. The Company was incorporated in Delaware on May 2, 2025, and moved its incorporation to Texas in June 2025. Its principal executive offices are in Scottsdale, Arizona.

### 2. BRC Buys Up Franchise Stores and Starts Expanding

51. BRC started as a franchise system and began purchasing or "rolling up" its franchised locations around 2018 and 2019. In or about 2020, the Company obtained a senior secured lending facility to finance its "roll-up of franchise stores and new store expansion."

52. In 2021, the Company repurchased all franchised units and became an entirely Company-owned chain. Several members of BRC's leadership had been franchisees themselves: Spellmeyer owned and operated multiple BRC stores as a franchisee from 2013 to 2018, and Chief Operating Officer Clay Geyer was a franchisee from 2016 to 2021.

53. According to FE-5 (described further below), of the roughly 50 Pacific Northwest BRC locations, at the time of the IPO, only one had been built since the franchise roll-up. Similarly, half of the California and Colorado stores were "roll-ups" of franchises. At the end of 2020, the Company had 71 stores and 158 by mid-2025.

### 3. BRC Concentrated New Stores in its Existing Markets

54. BRC stressed its plan to "favor growth in markets where we currently have a presence." This strategy involved putting 70% of its new openings in its "high-performing markets" and building outward in "concentric circles." The Company described its approach to entering new markets as a "clustered development approach," under which its "strategy is to initially establish density by opening several stores."

55. For example, in Phoenix, the Company added stores around existing high-volume locations. The density of the Company's Phoenix-area footprint is apparent from BRC's own store locator. As shown in the image below, which reflects the Company's store locations in the Phoenix metropolitan area as of September 25, 2026, the Company has placed over 50 stores in the region, many of which sit within blocks of one another.




56. BRC's increasing store density was underway in the weeks surrounding the IPO. On August 12, 2025, one month before the IPO, the Company announced that two new Phoenix stores would open within the following week, as well as two more Phoenix stores to open later in the year. In September 2025, the Company announced four more Phoenix-area openings scheduled for September and October 2025.

57. By late 2025, Phoenix was already heavily penetrated. The investment firm, D.A. Davidson, performed a market-by-market analysis based on the Company's own store list as of December 2025. That analysis concluded that the Portland market for BRC stores was "100%

saturated," and, using Portland as the benchmark, concluded that the Phoenix-Mesa-Chandler metropolitan area was already at 67% of that saturation level.

58. BRC's new stores require months, and often more than a year, of site selection, leasing, permitting, and construction. Further, by early October 2025, the Company had executed leases for 32 of the 33 stores in its 2025 pipeline and for 70% of its planned 2026 units.

59. Further, the Company's development model relied heavily on landlords. Most new stores were built under "build-to-suit" arrangements, in which a developer secures the land, prepares the site, constructs the building, and retains ownership of the property, while the Company purchases the equipment and pays the developer rent. At the time of the IPO, J.P. Morgan modeled approximately 95% of the Company's future pipeline as build-to-suit.

60. Under these arrangements, the landlord, not the Company, funded most of the cost of construction and recovered that cost through higher leases. As J.P. Morgan, the lead underwriter, explained shortly after the IPO, "[a] fully loaded ground lease with site/building/equipment would cost $1.7-1.8m vs BRCB's built-to-suit boxes requiring only $600-700k of upfront cash with the remaining $1.0-1.1m of landlord contribution in exchange for 7-8% annual rent payments ($75-85k)."

61. Around the time of the IPO, however, landlords were pulling back. For instance, as Davis later admitted, in the third quarter of 2025—the quarter in which the IPO occurred—four of the ten landlords whose stores the Company had guided to open that quarter backed out.

**4. BRC's Key Performance Measures**

62. The Company identified same store sales growth and Average Unit Volume ("AUV") as key performance measures that its management used to evaluate the Company's performance. Same store sales growth is "the period-over-period sales comparison for stores in our comparable store base, which we define as stores that have been open for 18 months or longer."

AUV represents total trailing 12-month store revenue of stores in the comparable store base, divided by the number of those stores. The Company further told investors that "AUV is impacted by changes in guest traffic."

63. Same store sales growth was also a principal driver of the Company's revenue growth. For the six months ended June 30, 2025, same store sales growth contributed $7.1 million—approximately 38%—of the Company's $18.6 million increase in store revenue, and increased guest traffic alone was listed as contributing $5.9 million, nearly one-third of that increase.

64. The Company explained that it uses same store sales growth to assess "the performance of existing stores . . . as the impact of new store openings is excluded." Because new stores are excluded, a new store placed near an existing store does not count toward same store sales growth, but the customers it draws away from the existing store do, as lost sales at that existing store. The Company refers to this phenomenon as "sales transfer."

65. By the first half of 2024, sales at the Company's existing stores were already slowing. Same store sales growth fell from 7.6% in the first quarter of 2023 to 6.4%, 3.1%, 3.8%, and 2.9% in the following quarters, and was just 3.9% in the second quarter of 2024. AUV also stalled, falling to $1.158 million as of June 30, 2024, below the $1.249 million reported a year earlier.

66. During the same time period, fewer transactions were also being made at the Company's existing stores. According to Company data reported by J.P. Morgan, same-store traffic declined in each of the four quarters before June 2024: by 0.7% in the third quarter of 2023, 0.2% in the fourth quarter of 2023, 5.3% in the first quarter of 2024, and 1.9% in the second quarter

of 2024.[1] The modest same store sales growth the Company did report in those quarters came from price and mix, which contributed 3.8% to 4.0% in each quarter, and from higher average checks (amount of money paid per customer order)—not from more transactions. For fiscal 2024, only 0.5 percentage points of the Company's 6.3% same store sales growth came from increased guest traffic; the remainder came from price increases and check size.

**5. BRC's Loyalty Program**

67. Initially, BRC implemented a loyalty program in which customers earned a free drink of any size after 10 purchases, and purchases counted toward that reward without expiration.

68. In June 2024, BRC entirely revamped its loyalty program and relaunched it as a digital, points-based program called "Black Rock Rewards." At the same time, it introduced mobile ordering. The Company announced the relaunch on June 26, 2024, in a press release issued with its loyalty-technology vendor, Paytronix.

69. Under the new program, every customer who signed up received a free medium drink upon signing. Free-drink redemptions were factored into the Company's reported same-store sales growth metric. Members then earned two "bolts" for every dollar spent. At the time of the launch, members could redeem 170 bolts for a free medium drink, and the free welcome drink carried a 180-day expiration.

70. By June 27, 2025—less than three months before the IPO—the Company had restructured the program. It was changed to 200 bolts for a free drink and a 60-day expiration for a welcome drink. The revised terms also required every new member to complete a two-factor authentication process before the free welcome drink would load, a measure consistent with the

[1] J.P. Morgan's tables reporting these figures identify their source as "Company reports and J.P. Morgan estimates."

Company's acknowledgment that it was combating "fake loyalty accounts created to receive free drinks."

**B. BRC Launches Frozen Fuel**

71. In early 2024, BRC began rolling out its "Frozen Fuel" drink line in select stores. This offering was a completely new menu, consisting of frozen versions of its proprietary, in-house developed "Fuel" energy drinks.

72. The Company initially rolled out Frozen Fuel in Arizona and California in 2024. In order to implement the Frozen Fuel menu, stores needed to make additional space as well as changes to electrical, water, and power equipment. The Frozen Fuel menu was rolled out systemwide in June 2024 and, according to FE-5 (defined below), had fully ramped across the Company's stores by early 2025.

73. Frozen Fuel's share of sales rose from 3% in the first quarter of 2024 to 7% by the second quarter of 2025, lifting the Company's overall Fuel share from "about 17% in early 2024" to "nearly 24%," an increase "almost entirely driven by Frozen Fuel." Frozen Fuel's share of sales stopped growing at these levels after the second quarter of 2025.

**C. The IPO**

74. On September 9, 2025, the Company filed with the SEC its final amendment to the Registration Statement on Form S-1/A (Registration No. 333-289685), which registered shares of the Company's Class A common stock for public sale. The SEC declared the Registration Statement effective on September 11, 2025. On September 15, 2025, the Company filed the final Prospectus for the IPO on Form 424B4, which is dated September 11, 2025, and forms part of the Registration Statement.

75. The Prospectus offered 14,705,882 shares of Class A common stock at $20.00 per share and granted the Underwriter Defendants an option to purchase up to 2,205,882 additional

shares. The shares were priced above the $16.00-to-$18.00 range at which they had been marketed. On September 15, 2025, the IPO closed with the Underwriter Defendants' exercise in full of their option to purchase additional shares, for a total of 16,911,764 shares sold at $20.00 per share, generating gross proceeds of approximately $338.2 million and net proceeds of approximately $306.5 million.

76. In advance of the IPO, Defendants marketed the Offering to institutional investors through a roadshow. Davis later described telling the Company's story "eight to 10 times a day."

**D. BRC's Share Price Plummets**

77. On May 12, 2026, after the market closed, the Company reported its first-quarter 2026 results and disclosed the sales transfer from its Phoenix densification and the lapping of its loyalty-driven transaction growth.

78. On this news, BRC's stock price fell $3.32 per share, or 30.3%, from a closing price of $10.97 on May 12, 2026, to close at $7.65 per share on May 13, 2026.

79. The decline continued over the following two trading days. BRC's stock fell to $7.16 per share on May 14, 2026, and to $7.01 per share on May 15, 2026—a cumulative decline of approximately 36% from the May 12, 2026 close.

80. At $7.01 per share, BRC stock had lost approximately 65% of its value from the $20.00 Offering Price only eight months after the IPO.

81. All told, the decline from the $20.00 Offering Price to the May 13, 2026 closing price of $7.65 represents approximately $618 million in lost market value.

### E. **Post-IPO Information Reveals the Untrue Statements and Material Omissions in The Offering Documents**

82. Former Employee ("FE") -1 was the General Manager of a BRC store in Chandler, Arizona (in the Phoenix metropolitan area) from October 2021 to September 2026. FE-1 ran the store's general operations, including labor and shift assignments, sales, and inventory.

83. FE-1 stated that while employed there, the Company was "*opening stores out the wazoo*," including three stores "literally eight minutes from each other." FE-1 explained that when new stores nearby opened, existing stores, "were left behind." For example, existing stores would not be afforded necessary equipment (such as a cold brew machine) when new stores—with all new equipment—were opened. Similarly, FE-1 further explained how some of the existing store's employees were sent to help during new store openings and the priority was taken away from existing stores.

84. FE-1 detailed how FE-1's sibling worked at another Arizona BRC store at Arizona Avenue and Frye Road in Chandler, a few miles from FE-1's store. FE-1 recalled that when that store opened in 2021, it "was super busy and sales were great." Now, according to FE-1, "it's one of the slowest stores in Arizona and it sucks because [they're] still expected to hit the same targets."

85. FE-1 stated that corporate management set weekly and monthly sales targets for stores and pressed employees to hit them. FE-1's targets were "$45,000 worth of sales in a week, and about $180,000 in a month." FE-1 often could not meet these targets, especially in 2025 and 2026, and blamed the Company's expansion directly: "*you guys opened up four new stores, [sales targets] are not going to happen.*"

86. FE-1 also confirmed the loyalty program details described above. According to FE-1, management ran "a competition about trying to push people to sign up" and told employees that "everyone who comes in needs to sign up for the app."

87. FE-1 described customer dissatisfaction with the program because customers "lost their points from the old program," and stated that FE-1 "would have to comp their drinks in apology and that would affect sales."

88. FE-2 was a Shift Lead at a BRC store in Ocotillo, Arizona (in the Phoenix metropolitan area) from October 2021 to August 2025. FE-2 was responsible for inventory, daily staff assignments, and staffing levels. FE-2 had friends working at other BRC Arizona locations with whom FE-2 communicated.

89. FE-2 stated that employees at other locations reported that "any new store opening up near them would cause a plummeting in sales." FE-2 noted that even employees without access to official sales figures could see it in their tips: "as an employee you keep track of tips," and staff "would make a lot less when other stores opened up." According to FE-2, every new opening prompted the same concerns among co-workers: "Are my hours going to get cut? Is it a problem? Are sales going to go down?"

90. FE-2 also verified the loyalty program details, confirming that new members received a free medium drink for joining. According to FE-2, under the new loyalty system "people were coming in making accounts with fake emails, bombarding us with free drink requests."

91. FE-2 explained that the new loyalty program required customers to download a new app and create an account, and that the Company incentivized customers to do so with free delivery through the app or a reduction on orders placed between certain dates.

92. FE-3 was a Store Lead at BRC stores in Texas from July 2023 to March 2026. FE-3 spent two years at a Kyle, Texas BRC location and then one year at an Austin, Texas location. FE-3 was responsible for overseeing staff, promoting products, managing inventory, running

weekly meetings, and scheduling employees. FE-3 reported to a multi-store lead, who in turn reported to an area manager. FE-3 described the Company's hierarchy as follows: "the tiers are barista, assistant store lead, store lead, multi-store lead, and then area manager."

93. FE-3 had a friend that worked at the Cedar Park, Texas location. FE-3 stated that store leads communicated with one another in group chats and on the Company's Slack channel, and through those conversations they learned that the busy Cedar Park, Texas store—that averaged $100,000 in sales per week—was hurt when the Company "opened up another location that was super close to it *and sales basically cut that number in half*."

94. FE-3 also verified the loyalty program details, including the free medium drink at sign-up. FE-3 stated that "all the stores had to do the loyalty program," and that baristas "had to ask every single customer if they had an account or if they could sign them up."

95. FE-4 was a Store Lead at a BRC store in Scottsdale, Arizona (in the Phoenix metropolitan area) from October 2023 to January 2026. FE-4 was responsible for "managing scheduling of employees, managing inventory on a weekly and monthly basis, conducting interviews to hire staff, and attending to customers." FE-4 reported to a multi-store lead, who in turn reported to an area manager responsible for approximately seven to eight stores.

96. FE-4 explained that store leads participated in weekly meetings with multi-store leads and area managers, during which they would "go over weekly sales, food waste, food drinks, changes in employment, window times, secret shopper reports." According to FE-4, "numbers like sales and customers were automated through a POS system," and those numbers were sometimes provided to store leads during the weekly meetings.

97. FE-4 recounted that management "would be able to kind of see when [the store] was struggling because of a dip in sales." FE-4 noted that such dips would be reflected in the

Company's point-of-sale system—part of the integrated point-of-sale and labor-scheduling systems that the Offering Documents described as providing "real-time monitoring of sales and labor cost."

98. FE-4 saw these sales dips firsthand at weekly meetings. FE-4 detailed that "20 minutes from [their store] there was a store that opened up a mile apart from another one and they were definitely affected by that." The affected existing store referenced was located off of Tatum Road, and the new store that opened was on 32nd and Greenway in North Phoenix.

99. FE-4 stated that employees would "know a year in advance if a new store was opening up," because "employees would be trained in opened stores and be moved over."

100. FE-4 also verified the loyalty program details, corroborating that the transition to the new loyalty program wiped out the rewards that longtime customers had accumulated. FE-4 recalled that BRC implemented a new loyalty program in June 2024, and that "it was definitely quite a pain."

101. As FE-4 explained, for up to a year after the new program was implemented, customers continued to ask for the free drinks they had earned under the prior program, and they would often have to "comp drinks" for customers to try to make up for it.

102. FE-4 explained that over the year after the new program launched, BRC kept updating it with new promotions. According to FE-4, "on certain days they would do a promotion item if they wanted to push a pastry, so customers would get 50 extra points if they bought a pastry." FE-4 also recalled other additions, including "a free birthday drink reward" and "a free drink for every new customer signing on to the program app."

103. FE-5 was interviewed by AlphaSense on September 29, 2025.[2] FE-5 was BRC's Director of Construction from 2019 to November 2023. FE-5 joined the Company in 2019 "at the request of one of the board members, Jake Spellmeyer, to launch their construction team," oversaw new store development during which the Company opened "about 100 locations," and ultimately reported to Davis. In that role, FE-5 "worked with a real estate team for site selection," "worked closely with operations during the store handoff," and worked with operations on the rollout of new menu items. FE-5 left the Company in 2023 and was the most senior person to leave BRC in several years. FE-5 continues to work in commercial construction and remained aware of BRC store openings and details as of the time of the AlphaSense interview.

104. FE-5 outlined the rollout of the Frozen Fuel menu, explaining that it was first rolled out in 2024 in Arizona and California and then progressively in other markets, and described the Frozen Fuel menu as not a minor, but a "significant menu item." FE-5 explained familiarity with the roll out because of the need to make changes to the spaces, including electrical and power equipment, for the new menu items.

105. FE-5 noted that by early 2025, Frozen Fuel had been ramped up and therefore, comparing results from the first half of 2024, when Frozen Fuel was still being introduced, with the first half of 2025, when it was in every store, showed "how same-store sales are popping off because there's a new menu item." FE-5 explained early 2025 as having "a big boost" from Frozen Fuel.

106. FE-5 further stated that the Frozen Fuel rollout—a key driver of the Company's same store sales growth—was something that "may be missing in their presentation." FE-5 also explained that the step-up could not be repeated without a new launch: "Do I believe their same-

[2] AlphaSense is a market-intelligence platform that provides access to research and various other types of market-relevant information and publishes interviews with industry professionals familiar with a given company.

store sales can jump 10%? It's hard for me to believe that. *You need another magic trick*. . . . *Unless there's another hat trick, I just don't know what it is*." (Emphasis added). As FE-5 summarized, shortly after the IPO, "[t]he same-store sales is jumping off the page right now. I think that needs questions."

107. FE-5 explained that, absent one-time launches, the Company's existing stores had limited capacity to grow traffic. FE-5 stated that the Company had historically relied on price increases, rather than guest traffic, to drive same store sales growth, and stated that the Company's growth problem was "no longer a menu item or a ticket item, this is definitely a car count item." Referring to the Company's Texas stores, FE-5 stated: "Texas has always been a problem. We just cannot get cars to show up."

108. FE-5 also explained that the Company started purchasing franchise locations around 2018 and 2019, and "[e]verything in the Pacific Northwest is a roll-up of franchises." FE-5 further detailed that half of the Colorado and California stores were also "roll-ups" of franchises. FE-5 thus summarized: "They didn't start with one store and built 157 stores, they purchased, let's call it, 60 stores and built the rest." According to FE-5, this was not "organic growth."

109. FE-5 looked at the various BRC markets and concluded that the Company had shown it could successfully open a new market from scratch only once: "Pacific Northwest was not organic growth. . . . Arizona is a new market, they did great. Texas, they did bad. They've only shown they could do it once and they've shown that they've messed up once. That's a pretty small sample size." And, in regard to Arizona, FE-5 also explained that there was a lack of competition initially in Arizona explaining the "initial" and "explosive" early growth in the state.

110. Further as to Texas, FE-5 outlined that "Texas has always been a problem," "Texas has not done well," and it "doesn't look like they fixed the Texas problem." FE-5 also noted that

every market in which the Company operated was one it had operated in "two years ago," and that FE-5 was "not aware of a new market that did open in the last two years [2023-2025]."

111. FE-5 was also skeptical of the Company's planned acceleration toward 1,000 stores, noting that the Company was "promising a pretty steep increase in store count" at a time when "the cost of development is almost double" what it was in 2019 through 2022, such that "[a] lot of historical numbers aren't going to be valid." FE-5 stated that the Company could not simultaneously hit both its store-growth targets and its promised cash-on-cash returns: "I do not think it is possible to hit both. One of them is going to fail."

112. FE-5 further explained how the Company's reported average development cost was "not forthcoming because it says a historical average," and that "[s]omebody needs to ask the question, 'How far back are you going? Are you going back to pandemic prices?'… [I]t's useless information for an investor because people just want to know what is it going to cost today. They're not answering that question."

113. FE-5 explained how the Company's build-to suit model, whereby landlords would cover the up-front building cost of new BRC stores in exchange for higher-priced leases, and which allowed BRC to report lower average building costs, was no longer feasible. FE-5 stated that the marketplace had been really rocked by inflation with build-to-suit, noting that between 2020 and 2022, building costs doubled. As such, according to FE-5, landlords would sign leases, but their expenses increased dramatically, and they were unable to increase the lease price. As a result, FE-5 stated that "most developers have dropped the built-to-suit model. I don't know if it's coming back."

114. As such, regarding BRC's reported average cost for new stores, FE-5 explained that "that number they're advertising is artificially depressed because there are some built-to-suit

projects in there"—projects in which the developer funds construction and recovers its cost through a higher lease rate. This meant that the Company had to "hide a $1 million somewhere," or, as FE-5 put it, "if you take a look at the mid 6 figure number, *it is a little misleading*." FE-5 explained this, stating that the number was "not qualifying that, in a footnote, costs are buried in operating costs or expenses are buried in operating cost."

## V. MATERIALLY MISLEADING STATEMENTS AND OMISSIONS

115. The Offering Documents were negligently prepared and, as a result, contained material misstatements and omissions generally falling under three separate categories: (i) regarding "sales transfer" among BRC's stores within the same geographic region; (ii) regarding same store sales, and in particular same store sales growth at the time of the IPO; and (iii) regarding the Company's new stores.

### A. Statements Regarding Sales Transfer

116. The Offering Documents contained numerous misstatements regarding "sales transfer" among stores in the same geographic region. Those included:

(a) Under the heading "Existing Markets," the Offering Documents stated:

> Our positive momentum and success of new openings confirms the significant demand for new Black Rock stores. We will focus our growth in existing markets where we believe there is an opportunity to increase density with minimal sales transfer.

(b) The Offering Documents repeated that assurance under the heading "Focused Growth Within Existing Markets and Strategic New Market Entry":

> Our expansion strategy is designed to balance near-term growth within our existing footprint with disciplined entry into new, high-potential markets. . . . *We believe there is an opportunity to increase density in existing markets with minimal sales transfer and also believe there is upside in our brand awareness that will enable further growth of our AUVs in these markets.*[3]

[3] Unless otherwise stated, all emphasis in quoted material is added.

(c) The Offering Documents also contained a risk factor stating, in relevant part:

> [O]ur AUV and comparable sales may not increase at the rates achieved over the past several years. . . . Additionally, opening new stores in existing markets may negatively impact sales at our existing stores, even if it increases overall AUV in a region over time. . . . As a result, the opening of a new store in or near markets in which we already have stores could adversely impact sales at these existing stores while ultimately growing the overall AUV in a region. . . . *Sales transfer between our stores may be significant in the future as we continue to expand our operations and could affect our revenue growth, which could, in turn, harm our business.*

117. Statements (a) through (c), identified in ¶116, were materially false and misleading, and omitted material facts, because they omitted to state that the Company's new store openings were leading to, or were reasonably likely to lead to, the cannibalization of its existing stores' sales and revenue, and they overstated the extent to which the Company's expansion strategy was designed to avoid sales transfer.

118. The Company's growth strategy was not designed to keep sales transfer "minimal." For example, in Phoenix, the Company's , most mature, and most penetrated market, Booth later admitted that the Company was adding stores "around existing high-volume locations," including stores "within five miles of some existing stores," a placement Davis later acknowledged was "strategic and intentional." The Company's own description of its strategy confirms the point. Davis explained that the Company was "putting 70% of our new openings in our high-performing markets" and building outward in "concentric circles" so that customers "see Black Rocks continuously." In 2025 alone, the Company added 14 stores in Arizona—approximately 44% of all stores it opened that year—to a Phoenix market that D.A. Davidson calculated was already at 67% saturation. *See* ¶¶54-57, 157.

119. The result of this strategy was significant cannibalization or sales transfer. When a new store opened near an established store, the sales that shifted to the new store reduced sales at the established store, lowering same store sales growth, while the new store's own sales were

excluded from the metric. *See* ¶¶62, 64. FE-1, a General Manager, observed that the Company was "opening stores out the wazoo," including three stores "literally eight minutes from each other," and that FE-1's store's sales targets were "not going to happen" because "you guys opened up four new stores." FE-2 likewise reported that a new store opening nearby "would cause a plummeting in sales." FE-4 also confirmed a drop in sales from an existing store in her region, when another store opened less than a mile away. And the phenomenon was not limited to Arizona: FE-3 reported that a busy store in Cedar Park, Texas, was hurt when the Company "opened up another location that was super close to it and sales basically cut that number in half." *See* ¶¶83-85, 89, 93, 98.

120. At the time of the IPO, stores close in proximity to other stores were already in the Company's development pipeline. Booth later admitted that the stores causing sales transfer were "stores that we opened at the end of 2025 or towards in the second half of 2025," and Davis told investors in June 2026 that the three stores the Company had placed near its highest-volume Phoenix locations would lap in September 2026—that is, they had opened in or around September 2025, the month of the IPO. According to FE-4, employees would "know a year in advance if a new store was opening up," because "employees would be trained in opened stores and be moved over." *See* ¶¶56, 58, 99, 157.

121. Defendants' post-IPO statements and actions also confirm the falsity of the above statements:

- On May 12, 2026, Davis acknowledged the need to be "careful that we're not opening a bunch of stores that cannibalize other stores."
- At the June 3, 2026 William Blair Growth Stock Conference, Davis admitted, "I think looking back on it, and the advice that we've been given and we've talked about is that if you're going to grow as a public company, ideally you would spend that capital in a place where you're not going to see sales transfer."

- At the same conference, Davis stated in reference to same store sales growth: "[n]aively, I probably made the comment on the earnings call that I said, 'Hey, we were at 5.2 and we could have been bigger had we not made the decision to drop three in Phoenix that are right next to really big, call it $2.5 million stores.'"
- On August 11, 2026, the Company described changes to its site-selection practices. Davis stated that "[u]nder our new Chief Development Officer, Jon Vingo, we have added even more rigor to site selection," and that the Company would "continue to develop in Phoenix, but we're going to do that in a way where we make sure that we don't have the sales transfer, that we have enough space between our existing stores and the new stores." Davis added that, going forward, "we're going to be in places where we've got plenty of space between stores."

122. As to Defendants' post-IPO conduct, the Company's first annual report dropped the Offering Documents' assurance that it could "increase density" in existing markets "with minimal sales transfer." On May 12, 2026—the day the Company first disclosed any sales transfer—it replaced the head of development who had overseen the Company's new store development, including during the period in which the Phoenix stores were placed. *See* ¶158.

123. As such, statements (a) and (b) above proclaiming "minimal" sales transfer were false and misleading because, as explained by FEs, demonstrated by the Company's actual numbers, and confirmed by Defendants' later statements and actions, the Company's strategy of building within already dense areas was harming existing stores, and the Company's densification of its most mature markets was already shifting sales from existing stores to new ones, and was reasonably likely to continue doing so, at the time of the IPO. *See* ¶¶83-85, 89, 93, 98.

124. BRC's failure to disclose that its strategy to open stores in "concentric circles" was harming existing stores was materially inaccurate and misleading for the additional, independent reason that BRC was required to disclose those facts under SEC Regulation S-K, 17 C.F.R. §229.303 (Item 303). Item 303 required disclosure of known events or uncertainties that at the time of the Offering had caused, or were reasonably likely to cause, BRC's disclosed financial information not to be indicative of future operating results. At the time of the Offering, information

was available to BRC that showed the high number of new stores opened or soon opening near existing stores and the effects such stores had on existing stores, none of which were consistent with its statements. The Offering Documents' silence on these trends and uncertainties rendered the disclosed financial results and trends materially misleading and not indicative of the Company's future operating results, in violation of Item 303.

125. As to statement (c) above, sales transfer was not a hypothetical risk. Defendant Booth later acknowledged that "historically, when we have only a few instances, those stores really build back in the next 12 to 24 months"—an admission that the Company had previously experienced sales transfer, monitored the affected stores, and tracked how long they took to recover.

126. While the Offering Documents cautioned that sales transfer "may be significant in the future" and "could" affect revenue growth, the transfer was already embedded in the Company's development plans. SEC Regulation S-K required the "Risk Factors" section of the Offering Documents to discuss the material factors that made the Offering speculative or risky and to adequately describe each risk. BRC's risk factors did not adequately warn investors of the already-occurring negative trends the Company was experiencing. Defendants' omission of that information rendered the Offering Documents' references to risks that "may" affect the Company materially inaccurate and misleading.

**B. Statements Regarding Same Store Sales**

127. The Offering Documents misrepresented "same store sales" and "same store sales growth"—among the Company's key performance measures—in several ways:

(a) They reported same store sales growth of 10.1% for the six months ended June 30, 2025, compared to 3.4% for the same period of 2024; 6.3% for 2024 and 5.1% for

2023; and quarterly same store sales growth of 9.2% and 10.9% for the first and second quarters of 2025, respectively.

(b) In discussing the Company's results for the six months ended June 30, 2025, the Offering Documents attributed the Company's same store sales growth primarily to increased traffic:

> The remainder of the increase was primarily driven by Same Store Sales Growth of 10.1%, which contributed $7.1 million, which consists of 3.8%, or $2.7 million, from menu price increases, and *8.4%, or $5.9 million, from increased traffic*, offset by a decrease of 2.1%, or $1.5 million, due to decreased check size as a result of higher discounting for the six months ended June 30, 2025, compared to the six months ended June 30, 2024.

(c) The Offering Documents gave the impression of sustained program growth. Under the heading "Growing Our Brand," the Offering Documents stated:

> *We see significant opportunity to drive greater traffic as we continue to add more loyalty members in existing and new markets.*

128. Statements (a) through (c), identified in ¶127, were materially false and misleading, and omitted material facts, for numerous reasons:

129. *First*, the Company's same store sales growth was inorganic and artificial for multiple reasons, including that it was driven in large part by the one-time introduction of the Frozen Fuel menu. That menu was first introduced in 2024 and was in all stores by early 2025. As FE-5 explained, comparing same store sales growth for the first half of 2024 with the first half of 2025 showed "how same-store sales are popping off because there's a new menu item." The numbers demonstrate this: Frozen Fuel lifted the Company's overall Fuel mix from about 17% of sales in early 2024 to nearly 24% and then stopped growing. J.P. Morgan, the lead underwriter, listed the Frozen Fuel launches among the "[i]mportant laps to consider." The introduction of Frozen Fuel was a one-time event that boosted sales but was not recurring and could only be repeated with "another magic trick." *See* ¶¶71-73, 105-106.

130. *Second*, same store sales growth was also inorganic, artificial, and temporary at the time of the IPO because it was buoyed by the one-time effects of the relaunch and restructuring of the loyalty program. In 2024, the Company launched a new loyalty program in which every new member received a free drink and, in the first half of 2025, as Booth later stated, the Company was also running more welcome offers and more "start of the year" offers. These promotions temporarily increased transactions, while reducing check size. *See* ¶¶68–69, 156.

131. Former store employees confirm the push: every customer was asked to sign up and received a free medium drink for doing so; management ran competitions to drive sign-ups; customers were offered free delivery or discounts to download the app; and, over the year after the launch, the Company kept adding promotions such as free birthday drinks and "a free drink for every new customer signing on to the program app." They also detail how customers were creating accounts with fake email addresses in order to exploit the free drink after the program was launched. Defendants have since confirmed that these free drinks were factored into the Company's reported transactions (and thus same store sales growth figures). *See* ¶¶69, 86, 90-91, 94, 102.

132. Defendants' post-IPO statements and actions also confirm the artificial spike caused in part by the change in the loyalty program. By June 27, 2025, the Company had shortened the window for redeeming welcome and free-drink rewards to 60 days. Davis and Booth later admitted that the "growth of free drink redemptions" and the "structural changes made in the first half of 2025 surrounding the expiration of rewards" produced "elevated transaction activity" that the Company lapped in 2026. *See* ¶¶70, 138, 156.

133. As demonstrated in the reverse-engineered table below, same store sales growth jumped from 3.9% in the second quarter of 2024 to 8.6% in the third quarter, and was 9.5%, 9.2%, and 10.9% in the following three quarters, the last quarters reported before the IPO.

**Table 1: Same-Store Traffic/Transactions and Same Store Sales Growth by Quarter**

| Period | Same-store traffic / transactions | Same Store Sales Growth |
|---|---|---|
| Q1 2023 (pre-launch period) | 4.1% | 7.6% |
| Q2 2023 | 2.7% | 6.4% |
| Q3 2023 | (0.7%) | 3.1% |
| Q4 2023 | (0.2%) | 3.8% |
| Q1 2024 | (5.3%) | 2.9% |
| Q2 2024 | (1.9%) | 3.9% |
| *June 2024: loyalty relaunch and systemwide Frozen Fuel rollout* | | |
| Q3 2024 | 2.2% | 8.6% |
| Q4 2024 (high discounting) | 7.0% | 9.5% |
| Q1 2025 | 6.2% | 9.2% |
| Q2 2025 (last full quarter before the IPO) (high discounting and Frozen Fuel fully rolled out) | 10.4% | 10.9% |
| Q3 2025 (IPO quarter) | 6.1% | 10.8% |
| Q4 2025 | 4.2% | 9.3% |
| Q1 2026 | (0.6%) | 5.2% |
| Q2 2026 | (2.0%) | 4.2% |

134. *Third*, the statements were false and misleading because they misrepresented aspects of "traffic." Traffic is synonymous with "transactions" and is one of the key components in the equation for Same Store Sales (traffic+price+check/mix) and related growth. As the above chart demonstrates, same-store traffic moved from a 1.9% decline in the second quarter of 2024 to increases of 2.2%, 7.0%, 6.2%, and 10.4% over the next four quarters. The largest traffic gains coincided with the heaviest discounting, and discounting reduced the average check by 1.9% in the fourth quarter of 2024 and by 3.5% in the second quarter of 2025.

135. Measured against the Company's quarterly results, these launch-driven traffic gains were material. The $5.9 million that increased traffic contributed to store revenue in the first half of 2025 equates to approximately $2.95 million per quarter. That is over 5% of the $50.4 million

in total quarterly revenue reported pre-IPO (Q2 2025), and the $51.5 million in total quarterly revenue reported for the quarter of the IPO (Q3 2025).

136. But investors could not see these numbers. The Offering Documents disclosed traffic contributions only on a full-year and half-year basis and did not disclose that same-store traffic had declined in each of the four *quarters* before June 2024. Without that information, investors could not discern that the "increased traffic" was produced by the June 2024 launches rather than a continuation of organic growth.

137. Furthermore, the Offering Documents attributed 8.4 percentage points of first-half 2025 same store sales growth to "increased traffic" (i.e. transactions) without disclosing that this traffic was inflated by temporary launch effects—including free sign-up drinks, welcome offers, free-drink redemptions, and the 2024 Frozen Fuel rollout—that would not recur. *See* ¶¶69-73, 127, 156. As such, the statement that the Company saw "significant opportunity to drive greater traffic" was misleading because it omitted that the traffic the program had already generated was driven by these one-time incentives, which the Company would necessarily lap.

138. On August 11, 2026, Davis acknowledged that the Company's second-quarter 2026 decline in same-store transactions was "largely" attributable to lapping "the growth of free drink redemptions from the launch and transition of our loyalty platform in the second half of 2024 and the structural changes made in the first half of 2025 surrounding the expiration of rewards."

139. BRC's failure to disclose that same store sales growth at the time of the IPO was due to artificial one-time gimmicks was materially inaccurate and misleading for the additional, independent reason that BRC was required to disclose those facts under SEC Regulation S-K, 17 C.F.R. §229.303 (Item 303). Item 303 required disclosure of known events or uncertainties that at the time of the Offering had caused, or were reasonably likely to cause, BRC's disclosed

financial information not to be indicative of future operating results. As of the Offering, information was available to BRC that showed that same store sales growth was driven by Frozen Fuel and transactions associated with the new loyalty program and not organic increased guest traffic, none of which were consistent with its statements. The Offering Documents' silence on these trends and uncertainties rendered the disclosed financial results and trends materially misleading and not indicative of the Company's future operating results, in violation of Item 303.

**C. Statements Regarding Building New Stores**

140. Finally, the Offering Documents made material misstatements and omissions about new store additions and the costs of those stores:

(a) Under the heading "Expanding Our Store Footprint in New and Existing Markets," the Offering Documents stated:

> We are in the early stages of our long-term growth journey, *with significant whitespace in both existing and new markets*. We have a robust pipeline for development to support future anticipated growth. In the near term, we expect to open approximately 30 stores in 2025 and *expect our future average annual store growth to be consistent with our approximately 20% historical average annual store growth from 2020 through 2024. We believe that we can achieve 1,000 stores by 2035, with ample whitespace in our existing markets to support this growth.*

(b) With respect to the cost of opening new stores, the Offering Documents stated:

> Our new store development costs have historically averaged approximately $600,000 per store, which represents a blended cost based on various build types. Our contribution ranges from approximately $230,000 for a build-to-suit project to the entire project costs in the case of a ground lease. We generally target a first 18-month AUV of $1.1 million, store-level profit margin for mature stores (i.e. stores in the comparable store base) in excess of approximately 22% and Cash-on-Cash Return of approximately 40%.

141. The statements identified in ¶140 were materially false and misleading, and omitted material facts. Plaintiff does not challenge the 1,000-store goal as a projection. Rather, Plaintiff challenges the statements of present and historical fact on which that goal rested: that the Company

had achieved "approximately 20% historical average annual store growth from 2020 through 2024," that it had a "robust pipeline for development," and that it had "ample whitespace in our existing markets." These statements omitted facts that seriously undermined them.

142. Statement (a) above was false and misleading for several reasons. To begin with, it failed to disclose that historical growth had been greatly impacted by the one-time purchase of all franchised stores. The "historical" growth rate was measured from a December 31, 2020 baseline that preceded the Company's 2021 repurchase of all of its franchised stores, so a meaningful portion of that growth reflected the acquisition of existing stores rather than the opening of new ones. In fact, outside the franchise-built Pacific Northwest, the Company had successfully scaled only one market—Phoenix. As FE-5 put it, "[t]hat is growth, congratulations, but that's not organic growth." *See* ¶¶51-53, 108-109.

143. Additionally, the "ample white space in our existing markets" was not grounded in any factual reality. As discussed above, at least the Texas and Arizona stores were cannibalizing each other, and at the time of the IPO, the Company had only arguably proven success in one state: Arizona. And even that state had its own peculiarity as there was initially a lack of competition there, as explained by FE-5 and exemplified by, for example, the lack of certain competitors entirely in the state prior to recently. J.P. Morgan's own initiation report concluded that, among the Company's five "growing" states, "only Arizona – specifically the Phoenix market has proven success," and D.A. Davidson identified that "only one market (Phoenix) has so far been scaled successfully outside legacy markets in the Pacific Northwest." As FE-5 put it, the Company had "only shown they could do it once and they've shown that they've messed up once [in Texas]." *See* ¶¶89, 93, 109-110.

144. As to whitespace in alleged "new markets," the Company had no new markets. At the time of the IPO, BRC stores were in seven states (Arizona, Texas, Colorado, California, Oregon, Washington, Idaho). Subsequently, any new stores were built in those same seven states, with the largest share in Arizona.

145. The Company's "robust pipeline" was also already under strain. In the quarter in which the IPO occurred, four of the 10 landlords whose stores were slated to open that quarter pulled out, forcing the Company to pull stores forward from later periods to meet its targets. Davis later conceded that "if I could go back in time, we would have had more buffer as we went public." *See* ¶61.

146. Nor was the 1,000-store figure grounded in an assessment of available sites. Davis later explained that the target was derived simply by compounding the Company's existing store base at a 20% annual growth rate over the following decade. Davis described the target in the same terms on the Company's May 12, 2026 earnings call: "As we've committed to, we will, at a 20% growth rate, eclipse 1,000 units by 2035." FE-5, who oversaw the Company's new store development during their tenure, explained that the Company was "promising a pretty steep increase in store count" at a time when "the cost of development is almost double" what it had been, such that "[a] lot of historical numbers aren't going to be valid," and that the Company could not simultaneously achieve its unit-growth targets and its promised cash-on-cash returns: "I do not think it is possible to hit both. One of them is going to fail." *See* ¶111.

147. Tellingly, the Company's first annual report on Form 10-K, filed less than six months after the IPO, omitted the 1,000-store target altogether.

148. As to statement (b) above that new store development costs had "historically averaged approximately $600,000 per store," it was materially misleading because it omitted that

the average was depressed by landlord-funded build-to-suit construction whose true cost was shifted into higher rent, that full construction costs were far higher, and that the landlord funding on which the average depended was becoming harder to obtain. *See* ¶¶59-61, 113-114. The $600,000 figure affected cash-on-cash returns, unit level margins, and AUVs, which in turn played into total gross profit and overall margins for the Company. Indeed, when discussing AUVs and profitability, Defendants themselves referenced the average net investment per store.

149. The $600,000 figure was achievable only because, in build-to-suit projects, landlords funded the remaining cost of construction—roughly $1.0 to $1.1 million per store—and recovered it through higher leases. Indeed, within a month of the IPO, J.P. Morgan—the lead underwriter—reported that "[a] fully loaded ground lease with site/building/equipment would cost $1.7-1.8m," whereas BRC's build-to-suit stores required "only $600-700k of upfront cash with the remaining $1.0-1.1m of landlord contribution in exchange for 7-8% annual rent payments." FE-5 confirmed this, stating that the "mid 6 figure" average was "artificially depressed because there are some built-to-suit projects in there," was "useless information for an investor because people just want to know what is it going to cost today," and was "a little misleading." *See* ¶¶60, 112-114.

150. Both the reported costs of construction of competitors and the actual costs construction reported by BRC demonstrate further the falsity of the $600,000 figure. To begin with, competitors were reporting over $750,000 figures for drive-through only stores—which should be far lower than the lobby inclusive BRC stores. Similarly, competitors disclosed the parameters of build-to-suit lease arrangements. And filings with state licensing and regulatory bodies listed estimated construction costs for BRC stores far higher than $600,000. For example,

one BRC store in Texas—with a start date of June 30, 2025—had an estimated build cost of $1.1 million.

151. The build-to-suit structure also moved the true cost of new stores out of the Company's investment figures and into its operating expenses. Because landlords recovered their construction funding through higher rent, the Company's occupancy costs were elevated. J.P. Morgan reported that the Company's occupancy costs ran at approximately 8% of sales, and that "[t]he high occupancy rate is a function of high build-to-suit mix across the footprint where BRCB receives significant landlord contributions upfront in exchange for higher rent." As FE-5 put it, the "mid 6 figure number" is "not qualifying that, in a footnote, costs are buried in operating costs or expenses are buried in operating cost." *See* ¶114. And when J.P. Morgan calculated the Company's year-two cash-on-cash return "excluding landlord contribution, but including pre-opening," it arrived at 20%—half of the 40% the Offering Documents advertised.

152. The inevitable rise in building cost due to landlords' lower appetite for build-to-suit agreements (which FE-5 noted occurred prior to the IPO) bore out and was acknowledged by Defendants. To begin with, in the quarter of the IPO, four landlords had already withdrawn from planned projects. *See* ¶¶61, 113. Then, after the IPO, the Company itself disclosed that its new stores cost more than $600,000. In its first annual report, filed March 4, 2026, the Company stated that "[i]n 2025, the average new store investment cost was approximately $860 thousand . . . ."

153. In 2026, the Company then announced a "near-term shift towards more reverse build-to-suit projects" that "typically require higher upfront capital," and reduced its expected 2026 tenant-improvement allowances from $18–20 million to $15–16 million. J.P. Morgan likewise noted that a shift toward ground leases following "landlord/permitting delays" was "likely driving higher capital needs than expected." Taken together, these facts show that, when the

Offering Documents were issued, the $600,000 "historical" average did not reflect what it cost the Company to open a new store: it depended on landlord funding that was receding, it excluded construction costs that the Company was paying through higher rent, and it overstated the returns the Company could expect on the stores it was opening.

154. BRC's failure to disclose these facts was materially misleading for the additional, independent reason that Item 303 required their disclosure. The Company's historical store-growth rate, elevated by the one-time repurchase of its franchised stores, was a known trend or uncertainty that rendered the Company's historical growth not indicative of the rate at which it could grow by opening new stores. Likewise, the rising cost of new stores and the retreat of landlord funding were known trends and uncertainties that rendered the Company's "historical" development costs, and the financial metrics calculated from them, not indicative of future results.

**VI. POST-IPO DISCLOSURES**

155. On May 12, 2026, after the market closed, the Company reported its first-quarter 2026 results. Same store sales growth was 5.2%, down from 9.2% in the prior-year quarter; same-store transactions declined 0.6%; and revenue of $55.45 million missed consensus estimates. On the accompanying earnings call, Davis disclosed for the first time that sales transfer from the Company's densification had reduced same store sales growth:

> As we grow store density in these maturing markets and add new locations around existing high-volume stores, we are thoughtfully rebalancing demand across our store base to enhance the experience, grow our presence, strengthen our market position and better serve our guests. <u>*This dynamic can result in some sales transfer where a portion of volume from existing stores shifts to newer locations that have opened in closer proximity.*</u> In the first quarter, we saw this dynamic in Phoenix, creating a 160-basis point headwind to same-store sales.

156. Booth further disclosed that "[s]ofter transaction volume in the quarter stemmed from a challenging comp as the prior year period saw elevated transaction growth related to the early accelerated growth of our loyalty program, which launched in June 2024," and that "[i]n the

first quarter of 2025, we did have more discounting, more start of the year offers, welcome offers for our guests as that program is building."

157. When an analyst asked whether the first quarter of 2026 was the first quarter in which the Company had seen an impact or merely the first in which it was measurable enough to call out, Booth explained that the stores causing sales transfer were "stores that we opened at the end of 2025 or towards in the second half of 2025," and that they were "within five miles of some existing stores."

158. The same day, the Company announced the appointment of a new Chief Development Officer, Jon Vingo, to oversee "real estate and site selection, prototype design, and construction." The Company also announced the departure of Robert Kaufmann. Kaufmann had served as BRC's Vice President of Development from January 2015 to January 2025, and as its Chief Development Officer from January 2025.

159. Analysts, including one of the Underwriter Defendants, recognized the significance of these disclosures. Stifel cut its price target on BRC from $27 to $18, noting that the Company had disclosed the 160-basis-point sales-transfer headwind for the first time and attributing that headwind to strategic cannibalization as the Company infilled its existing markets.

160. On this news, BRC's stock price fell $3.32, or 30.3%, to close at $7.65 per share on May 13, 2026, on unusually heavy trading volume.

161. Accordingly, in only eight months, BRC's share price fell more than 61% from the $20.00 Offering Price, and investors lost approximately $618 million in market value.

## VII. CLASS ACTION ALLEGATIONS

162. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

163. Plaintiff brings this Action as a class action, pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of a class consisting of all persons and entities that purchased, or otherwise acquired, BRC Class A common stock issued pursuant or traceable to the Offering Documents in connection with the Company's IPO, and who were damaged thereby (the "Class").

164. Excluded from the Class are: (i) Defendants; (ii) present or former executive officers of BRC, members of BRC's board of directors, and members of their immediate families (as defined in 17 C.F.R. §229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the foregoing persons' legal representatives, heirs, successors, or assigns; and (iv) any entities in which any Defendant has or had a controlling interest, or any affiliate of BRC.

165. The members of the Class are so numerous that joinder of all members is impracticable. The Company's Class A common stock was actively traded on the Nasdaq, a national securities exchange, and the Company sold more than 16.9 million shares in the IPO. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by BRC or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

166. Plaintiff's claims are typical of the claims of Class members, who were all similarly affected by Defendants' wrongful conduct in violation of the federal securities laws and their role in issuing or signing the defective Offering Documents or in underwriting the IPO. Further,

Plaintiff will fairly and adequately protect the interests of Class members and has retained counsel competent and experienced in class and securities litigation.

167. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants violated the Securities Act;

(b) whether the Offering Documents contained materially inaccurate or misleading statements about the business, operations, and prospects of BRC;

(c) whether the Offering Documents omitted material facts required to be stated therein or that were necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(d) the extent of damage sustained by Class members and the appropriate measure of such damage.

168. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VIII. CLAIMS FOR RELIEF

### CLAIM ONE

### For Violations of §11 of the Securities Act (Against All Defendants)

169. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

170. This claim is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants. This is a strict liability cause of action.

171. Plaintiff does not (and need not) allege that any Defendant intended to mislead investors in publishing the materially misleading statements and omissions in the Offering Documents. Plaintiff alleges that regardless of whether those misstatements and omissions were made innocently, negligently, recklessly, or intentionally, *prima facie* liability attaches because of the inaccurate and misleading nature of those material statements and omissions. Plaintiff, though disclaiming any obligation to do so, also states and avers that nothing pled herein requires a finding or necessary inference that any Defendant acted with fraudulent intent, inasmuch as it remains possible, for example, that the Individual Defendants may have innocently or negligently failed to disclose the matters alleged herein because they (a) honestly (though mistakenly) believed that the general risk disclosures in the Offering Documents adequately addressed sales transfer and the effects of the June 2024 launches; (b) erroneously believed that the transaction growth following the June 2024 launches reflected sustained changes in guest behavior; or (c) failed to analyze, or to ensure that Company personnel analyzed, the store-level sales, traffic, and loyalty data available to the Company before the Offering Documents became effective. Similarly, it is possible, consistent with the allegations set forth herein, that the Underwriter Defendants were simply operating under a misunderstanding as to the significance of the Company's store-level sales and traffic data and/or as to all of the steps that they could have taken to ensure that the statements in the Offering Documents concerning sales transfer, same store sales growth, guest traffic, the loyalty program, and Frozen Fuel were not materially false or otherwise misleading.

172. As to Defendant BRC, Plaintiff repeats and realleges its allegations that BRC is strictly liable in all scenarios for any materially false or misleading statement in the Offering

Documents, because as the issuer of the securities at issue, Defendant BRC does not have even the ability to try to assert a statutory affirmative due diligence defense (which is potentially available only to non-issuer defendants, i.e., the Individual and Underwriter Defendants).

173. The Offering Documents were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

174. As to the Individual Defendants, the Individual Defendants each signed or authorized the signing of the Offering Documents. As such, each is strictly liable for the materially inaccurate statements contained therein and the failure of the Offering Documents to be complete and accurate. Each Individual Defendant had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Documents and to ensure that they were true and accurate, that there were no omissions of material facts that would make the Offering Documents misleading, and that they contained all facts required to be stated therein. In the exercise of reasonable care, the Individual Defendants should have known of the material misstatements and omissions contained in the Offering Documents and also should have known of the omissions of material fact necessary to make the statements made therein not misleading. Accordingly, the Individual Defendants are liable under §11 of the Securities Act to Plaintiff and the Class.

175. As to the Underwriter Defendants, each Underwriter Defendant served as an underwriter of the IPO. As such, each is strictly liable for the materially inaccurate statements contained in the Offering Documents and the failure of the Offering Documents to be complete and accurate. Each Underwriter Defendant had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering

Documents, and to ensure that such statements were true and accurate, that there were no omissions of material facts that would make the Offering Documents misleading, and that the documents contained all facts required to be stated therein. In the exercise of reasonable care, each Underwriter Defendant should have known of the material misstatements and omissions contained in the Offering Documents and should have known of the omissions of material facts necessary to make the statements made therein not misleading. Accordingly, each Underwriter Defendant is liable under §11 of the Securities Act to Plaintiff and the Class.

176. None of the Individual or Underwriter Defendants named in this claim made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true, without omission of any material facts, and were not misleading. In alleging the foregoing, Plaintiff reiterates that it remains each Individual and Underwriter Defendant's burden to establish any affirmative "due diligence" defense in order to avoid strict liability for the Securities Act violations alleged herein. Plaintiff further reiterates that, as the issuer, BRC is strictly liable for the materially misleading statements and omissions in the Offering Documents, regardless of whether they were made innocently, negligently, recklessly, or intentionally.

177. By reason of the conduct herein alleged, each Defendant named in this claim violated §11 of the Securities Act.

178. None of the untrue statements or omissions of material fact in the Offering Documents alleged herein were forward-looking statements. Rather, each such statement (or omission of fact) concerned then-existing facts. Moreover, the Offering Documents did not properly identify any of the untrue statements alleged herein as forward-looking statements and did not disclose information that undermined the putative validity of these statements.

179. Plaintiff acquired the Company's securities pursuant or traceable to the Offering Documents and without knowledge of the untruths and/or omissions alleged herein. Plaintiff sustained damages, and the price of the Company's shares declined substantially due to material misstatements in the Offering Documents.

180. This claim is brought within one year after the discovery of the untrue statements and omissions and within three years of the date of the Offering.

181. By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to damages under §11, as measured by the provisions of §11(e), from the Defendants and each of them, jointly and severally.

## CLAIM TWO

### For Violations of §12(a)(2) of the Securities Act (Against All Defendants)

182. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

183. By means of the defective Offering Documents, Defendants promoted, solicited, and sold BRC shares to Plaintiff and other members of the Class.

184. The Offering Documents for the IPO contained untrue statements of material fact and concealed and failed to disclose material facts, as detailed above. Defendants owed Plaintiff, and the other members of the Class who purchased BRC shares pursuant to the Offering Documents, the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents, and to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Offering Documents, as set forth above.

185. Plaintiff did not know, nor in the exercise of reasonable diligence could Plaintiff have known, of the untruths and omissions contained in the Offering Documents at the time Plaintiff acquired BRC shares.

186. By reason of the conduct alleged herein, Defendants violated §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2). As a direct and proximate result of such violations, Plaintiff and the other members of the Class who purchased BRC securities pursuant to the Offering Documents sustained substantial damages in connection with their purchases of the shares. Accordingly, Plaintiff and the other members of the Class who hold BRC securities issued pursuant to the Offering Documents have the right to rescind and recover the consideration paid for their shares and hereby tender their BRC shares to the Defendants sued herein. Class members who have sold their BRC securities seek damages to the extent permitted by law.

## CLAIM THREE

### For Violations of §15 of the Securities Act
### (Against All Individual Defendants)

187. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

188. This claim is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o, on behalf of the Class against each of the Individual Defendants.

189. The Individual Defendants were controlling persons of the Company within the meaning of §15 of the Securities Act. By reason of their ownership interest in, senior management positions at, and/or directorships held at the Company, as alleged above, these Defendants invested in, individually and collectively, and had the power to influence, and exercised the same over, the Company to cause it to engage in the conduct complained of herein.

190. The Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of BRC within the meaning of §15 of the Securities Act. The Individual Defendants had the power and influence and exercised the same to cause BRC to engage in the acts described herein.

191. Each of the Individual Defendants not only controlled those subject to liability as primary violators of §11 of the Securities Act, as alleged above, but also directly participated in controlling BRC by having signed, or authorized the signing of, the Registration Statement and authorizing the issuance of BRC securities to Plaintiff and members of the Class.

192. As control persons of BRC, each Individual Defendant is jointly and severally liable pursuant to §15 of the Securities Act with, and to the same extent as, BRC for BRC's violations of §11 of the Securities Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A. Declaring that this Action is a proper class action, pursuant to Fed. R. Civ. P. 23, certifying Plaintiff as a representative of the Class, and designating Plaintiff's counsel as Class Counsel;

B. Awarding Plaintiff and the other members of the Class compensatory damages;

C. Awarding Plaintiff and the other members of the Class rescission and/or rescissory damages on their §12(a)(2) claims;

D. Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs and disbursements; and

E. Awarding Plaintiff and the other members of the Class such other and further relief as the Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff hereby demands a trial by jury of all issues that may be so tried.

DATED: November 2, 2026

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

*/s/ Amanda F. Lawrence*
Amanda F. Lawrence (AL8804)
Daniella Chuka (*pro hac vice* forthcoming)
156 South Main Street
Colchester, CT 06415
Tel.: (860) 537-5537
Fax: (860) 537-4432
alawrence@scott-scott.com
dchuka@scott-scott.com

Donald A. Broggi (DB-9661)
Nicolas Apter-Vidler (NY 5944186)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Tel.: (212) 223-6444
Fax: (212) 223-6334
dbroggi@scott-scott.com
napter-vidler@scott-scott.com

*Counsel for Lead Plaintiff Plymouth County Retirement Association*